IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| SEBASTIAN GOMEZ #698790 | § | |
| v. | § | CIVIL ACTION NO. 9:07cv208 |
| TDCJ-CID, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Sebastian Gomez, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violation of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment pursuant to 28 U.S.C. §636(c).

An evidentiary hearing was conducted on January 9, 2008, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his amended complaint, Gomez stated that he was asleep in his cell on the night of December 4, 2005, when about 1 a.m. on the morning of December 5, he was awakened by two inmates, Ibanes and el-Guzman, attempting to sexually assault him. Gomez said that Captain Pace was watching this from outside of his cell, and when Gomez complained to him, Pace replied that Gomez was a homosexual. Following the assault, Gomez says, Pace sprayed him with a gas that made him go to sleep.

On July 10, 2007, Gomez says, at around 3:00 a.m., an officer named Elio sexually assaulted him. Elio also put an unknown substance into Gomez's food which made him go to sleep. Before he went to sleep, he says, he saw two female officers, one inside of his cell and one outside, apparently watching the sexual assault; he identified one of the officers as being named Wigley.

Gomez says that he has tested positive for hepatitis B and that while at the Connolly Unit, he received three shots for this. He said that he no longer is sick, but that he is being housed around other inmates with this illness, and he fears that he will contract it again. Gomez also complained

that prison officials put gas in the shower and through the air vents, and it causes him to suffer skin irritation. He also complained that other inmates had put feces in his food or had masturbated in it.

Warden Pratt, a TDCJ official also present at the evidentiary hearing, testified that prison officials do not have a gas to put inmates to sleep, nor do they put additives into inmates' food to cause them to go to sleep. Nurse Barbara Hughes said that there is no mention of any sexual assault in Gomez's medical records or his sick call requests. She said that Gomez has tested positive for hepatitis C, not hepatitis B, and that the shots he received at the Connolly Unit were probably a vaccination for hepatitis B, to make him immune from the disease.

Chip Satterwhite, a TDCJ regional grievance coordinator, appeared at the hearing and said that Gomez had not filed any Step Two grievances on any of his complaints. Gomez acknowledged that this was true, explaining that he often could not get Step Two forms on the wing where he was housed.

## Gomez's Prison Records

The Court has received and examined copies of Gomez's prison records. As Nurse Hughes said, his medical records contain no mention of or complaints about being sexually assaulted at any time. His classification records do contain several life endangerment investigations, including one that included a sexual assault examination.

On May 24, 2005, Gomez filed a life endangerment complaint saying that his life was in danger because he is from Cuba and was shot by a gang. He says that "some dudes" saw him get shot and found out that he did not die, and they followed him from California to Texas to kill him. Gomez says that they "got inside the Texas prisons, and they all got arrested and they can't get out." Gomez says that he has had this problem since 1999, at the Clements Unit, the McConnell Unit, the Connally Unit, and the Eastham Unit. Now, he says, "they" are here and they continue to threaten him that he is going to be killed. Gomez says that he reported this to prison officials but they did not pay any attention to the dangerous position he has been in, on every unit where he has been

housed since 1999. He says that he would like to be moved and transferred to another unit, and says that "you can release all these dudes from Cuba when I leave." He asks that he be kept away from the inmates named Augusto Sepulveda, Ezquiero Iglesias, and some other inmate that follows these two everywhere.

The life endangerment investigator noted that none of the names which Gomez gave matched inmates at the Eastham Unit, and that Gomez had filed another life endangerment complaint while at the Connolly Unit, giving the same names, but there were no inmates with those names at the Connolly Unit either. The Unit Classification Committee chairman concluded that Gomez should be referred to the psychiatric department because nothing he said made any sense.

On September 30, 2005, an offender interview form says that one day earlier, Gomez was placed in pre-hearing detention for possession of a weapon. He said that he had the weapon because his life was in danger from the "Esquierdos" Cuban gang. Gomez stated that this gang had robbed and shot him in California, and had followed him to Texas to kill him. He explained that "Esquierdos" is the name of the gang and also the name of an individual; however, the only similar name in the TDCJ computer is Anton Esquerdo, who has been released and is no longer in TDCJ. The interview sheet observes that Gomez has made these same claims in each life endangerment investigation which has been conducted and has no new evidence or information, and recommended that the investigation be terminated as repetitive or frivolous. This recommendation was accepted by Major Butcher.

On December 19, 2005, an offender interview form says that Gomez claims that he is in danger from a Cuban gang on the Eastham Unit that knew him from California. Gomez stated that the gang members have "taken medication to change their appearance, but he knows them by their voices." Gomez could not give any names, descriptions, or housing locations; the interviewer noted that Gomez had made the same allegations in previous investigations without being able to give any new evidence or information to assist in the investigation, and so no further action was warranted.

Major Butcher accepted this recommendation as well. No mention was made of an alleged sexual assault occurring less than three weeks earlier.

On October 28, 2006, Gomez was interviewed by Lt. Haynes on a life endangerment complaint. At this time, Gomez said that on December 5, 2005, he was sexually assaulted; he explained that someone sprayed a gas into his cell, knocking him unconscious, and he felt someone penetrate his anus. He first said that two black officers stood at the door and allowed this to occur, but then said that Captain Pace had stood at the door. When asked the name of the perpetrator of the assault, Gomez said "Alex Iglesias." However, a name search revealed that the inmate named Alex Iglesias had never been assigned to the Eastham Unit.

Gomez also said that officers would come into his cell while he was asleep and put acid on him, causing his skin to burn and itch.[1] The psychiatric department was notified, but a forensic exam was not conducted on Gomez's sexual assault claim because of the lapse of time. Sgt. Haynes noted that Gomez had sent in numerous requests for a unit transfer, and that no evidence has been found to substantiate his claim of sexual assault.

A statement was taken from Captain Pace, who said that he was a disciplinary hearing officer and therefore was not in the housing areas, because the disciplinary proceedings were conducted in another part of the prison. He said that he did not witness Gomez being assaulted and that Gomez's allegations are false. A sexual abuse investigation checklist was completed, which said that the Office of the Inspector General and duty warden were notified, the Emergency Action Center was notified, and medical personnel were told to refer Gomez to an agency psychologist.

On June 26, 2007, Gomez was interviewed concerning claims that inmates and staff were trying to kill him. He stated that officers were "spraying him with some real strong gas." The interviewer noted that Gomez was "continuously altering his statements" and referring back to past allegations concerning a former cell partner named Keith Jordan. A database search was conducted

---

[1] Gomez's medical records make no mention of acid burns; however, they do show that Gomez suffers from a skin condition called eczema, which causes itching and burning sensations. *See* http://www.emedicinehealth.com/eczema/article_em.htm

and three inmates with the name of Keith Jordan were found, but none of these persons were currently incarcerated in TDCJ; however, Gomez claimed that this was the only inmate who was threatening him.

The interviewer also noted that a review of Gomez's classification records showed that n June 6, 2007, Gomez assaulted an officer named R. Raymond by spitting on him. Gomez claimed that Raymond still directs threats against him, but records show that Raymond has only been assigned to Gomez's new housing area twice, and the only interaction between them came when Raymond tried to feed him and Gomez "acted belligerent," The interviewer found no evidence to support Gomez's allegations and stated that Gomez was assigned to administrative segregation, which is the highest level of security.

None of Gomez's grievances contain any mention of being sexually assaulted. In June of 2005, he filed a grievance complaining about Keith Jordan, and also saying that someone on the unit is spraying tear gas through the air vents, which is causing him to suffer "contact dermatitis." He asked to be transferred to another unit, but the response was that he had provided no new information on his claims that his life was in danger and that he had a history of filing repetitive life endangerment complaints; he is quoted as telling Sgt. Sharp that he would continue to do so until he was transferred. The grievance response mentioned the June 2005 investigation and said that no further action was necessary.

Legal Standards and Analysis

The Court notes at the outset that Gomez has failed to exhaust his administrative remedies; TDCJ records show and Gomez acknowledges that he never filed a Step Two grievance. However, the Court will pretermit discussion of the exhaustion requirement at this time, because Gomez's claims clearly lack merit on their face.

In <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989), the Supreme Court held that "a complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact." The Court went on to say that a claim is legally frivolous

under Section 1915(d) when it is based on "an indisputably meritless legal theory." Neitzke, 490 U.S. at 327. The Fifth Circuit has noted that a finding of factual frivolousness is appropriate where the facts alleged rise to the level of the irrational or wholly incredible. Ancar v. Sara Plasma, Inc., 964 F.2d 465, 468 (5th Cir. 1992).

In this case, it is apparent that Gomez's claims are fanciful and wholly incredible. He alleges that in December of 2005, he was sprayed with a mysterious gas which put him to sleep, and that he awoke to find himself being sexually assaulted, while an officer who did not work in that area of the prison stood by and watched. He did not seek medical attention for the sexual assault or file a grievance concerning it, and in fact did not mention it to prison officials until over ten months later. The name he gave for the assailant in October of 2006, when he did report the incident, matched an inmate who was not at the Eastham Unit and in fact had been released from TDCJ.

In July of 2007, Gomez said that he was sexually assaulted by an officer named Elio, but again did not seek medical care or file a grievance about the incident, nor does he appear to have filed a life endangerment claim. Gomez's medical and classification records contain no reference to such an incident.

Gomez also claimed that prison officials were spraying tear gas through the air vents, causing him to suffer skin irritation. This allegation is also fanciful and wholly incredible. *See* Williams v. Collins, slip op. no. 92-4921 (5th Cir., March 18, 1993) (unpublished) (affirming dismissal, as factually frivolous, of complaint that prison officials were pumping toxic gas into an inmate's cell). *Accord,* Gordon v. Secretary of State of New Jersey, 460 F.Supp. 1026 (D.C.N.J. 1978) (prisoner denied the office of President of the United States because of his illegal incarceration in jail); Searight v. State of New Jersey, 412 F.Supp. 413 (D.C.N.J. 1976) (prisoner alleged that the defendants unlawfully injected him with a radium beam, so someone talks to him inside of his brain).

Similarly, Gomez complains that unnamed individuals have been putting "feces, saliva, and human waste" into his food, as well as masturbating in it. His medical records contain no indication

that Gomez ever complained of this to medical personnel, nor that he ever suffered any ill effects as a result of this alleged food tampering.

On May 1, 2007, Gomez filed a grievance complaining about conditions at the Eastham Unit, including the assertion that someone was putting human waste in his food, which he said happened "every day." The response to this grievance was that during the course of the investigation, Gomez was interviewed and indicated that he "considered this issue resolved." In the absence of any evidence of food tampering or of any harm from the alleged tampering, Gomez's claim on this point is without merit. *See* Cooper v. Bowles, civil action no. 3:91-CV-2622 (N.D.Tex., June 20, 1997) (unpublished) (available on WESTLAW at 1997 WL 361879) (noting that although the plaintiff identified various maladies which he said stemmed from the alleged food tampering, he failed to state the nature of the tampering or provide any factual support that the tampering had actually occurred, and so the Court held that the allegations "are insufficient to state a colorable claim under §1983 and will be dismissed).

To the extent that Gomez complains that prison officials have been deliberately indifferent to his safety, his claim is likewise without merit. The Fifth Circuit has held that prison officials have a duty not to be deliberately indifferent to the safety of their inmates. Johnston v. Lucas, 786 F.2d 1254, 1260 (5th Cir. 1986); Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986). A showing of mere negligent indifference is not enough for a constitutional claim. Davidson v. Cannon, 474 U.S. 344 (1986).

The Supreme Court has specifically addressed the issue of deliberate indifference to an inmate's safety in prison. The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); see Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

In this case, Gomez has failed to show that prison officials have been deliberately indifferent to his safety because he makes no showing that these officials know of and have disregarded an excessive risk to his health or safety. Instead, the evidence shows that Gomez has made numerous complaints that his life is in danger, and these claims have been routinely investigated. The fact that no evidence has ever been found to support the claims does not show that prison officials were deliberately indifferent; as noted above, Gomez has named persons who did not work in that part of the prison, and prisoners who were not even on the unit or confined in TDCJ, as the individuals involved in the incidents of which he complains.

Finally, to the extent that Gomez complains about the medical care which he has received, this claim is also without merit. He states that he has hepatitis B, but his medical records show that this is not the case; rather, he has hepatitis C, and Nurse Hughes' testimony indicates that the shots to which Gomez refers likely was the vaccine against hepatitis B. Gomez's chronic medical conditions are hepatitis C, hypertension, and hyperlipidemia, a excessive concentration of fats (such as cholesterol) in the blood. He has also complained at times of athlete's foot and eczema, and had previously been treated for tuberculosis. On June 28, 2006, Gomez was noted to have prescriptions for verapamil (a blood pressure medication), hydrodiuril (an anti-edema medication also used to treat high blood pressure), Tinactin (an anti-fungal used to treat athlete's foot), and Zantac (an antacid).

Gomez's medical records show that he routinely sought medical care, and that it was routinely given to him. When he complained about tuberculosis, he was given a chest X-ray. When he complained about skin problems, he was seen at sick call and given medication. The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received

has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756; *see also* Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

In this case, Gomez has failed to show that TDCJ personnel were deliberately indifferent to his serious medical needs. On the contrary, his medical records show that he was consistently given care when he sought it. Gomez's claims concerning his medical care are without merit.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

In this case, Gomez's claims are factually and legally frivolous, and so his lawsuit may be dismissed under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous as to its refiling in federal court. 28 U.S.C. §1915A(b). It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **30** day of **January, 2008.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE